**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| RONALD PUGH, | CIVIL ACTION |
| Plaintiff, | |
| | No. 2:23-cv-01520 |
| v. | |
| VALMONT INDUSTRIES, INC., | Judge Stickman |
| Defendant. | |

## AMENDED CIVIL COMPLAINT

Plaintiff, Ronald Pugh, by undersigned counsel, files this Amended Civil Complaint, and in support states the following.

### I. Parties, Jurisdiction, and Venue

1.     Plaintiff, Ronald Pugh, is an adult individual who resides in Chester, West Virginia.

2.     Defendant, Valmont Industries, Inc., is a Delaware corporation with a principal place of business located at 15000 Valmont Plaza, Omaha, NE 68154.

3.     Defendant operates a galvanizing facility, Valmont-Pittsburgh Galvanizing, in Midland, Beaver County, Pennsylvania.

4.     All of the transactions or occurrences out of which this cause of action arose took place in Beaver County, Pennsylvania.

5.     Defendant has removed this action to this Court, and thus admits that this Court has jurisdiction pursuant to 28 U.S.C. § 1332.

### II. Factual Background

6.     In or around November 2022, Mr. Pugh began working for Defendant as a Maintenance Technician.

1

7.     Mr. Pugh was supervised by Maintenance Coordinator Andrew Cellini.

8.     During his first week at Defendant, Mr. Cellini asked Mr. Pugh to perform maintenance tasks without safety measures in place that complied with the Occupational Safety and Health Act ("OSHA") and the Pennsylvania General Safety Law, 43 Pa. Stat § 25-1 *et seq.*

9.     Mr. Pugh told Mr. Cellini that he opposed doing the work without proper safety measures in place.

10.    Mr. Pugh's complaints to Mr. Cellini included, but were not limited to:

a.   Defendant failing to provide job briefings to Mr. Pugh or other employees;

b.   Defendant not utilizing crane lock out tag out procedures;

c.   Defendant never providing Mr. Pugh rubber gloves for work that required rubber gloves;

d.   Defendant never providing Mr. Pugh with a sufficient personal respirator;

e.   Defendant never providing Mr. Pugh a fall protection harness; and

f.   Defendant never providing Mr. Pugh with Confined Spaces training.

11.    On one occasion, Mr. Pugh opposed being required to do hot electrical work without the proper personal protective equipment ("PPE"), rubber gloves.

12.    Instead of supplying the necessary PPE to Mr. Pugh and as a result of Mr. Pugh's opposition, Mr. Cellini asked another employee to perform the hot electrical work.

13.    Mr. Pugh escalated a number of his complaints to the plant manager, John Metzger.

14.    On a number of occasions, Mr. Pugh told Mr. Cellini, Mr. Metzger, and Mr. Collins (title unknown), that he opposed performing work without the proper safety measures in place.

15.    During his first week, Mr. Pugh told Mr. Cellini that a number of Defendant's cranes had safety issues.

16.    When Mr. Pugh was tasked with performing safety inspections on the cranes, Mr. Cellini did not allow Mr. Pugh sufficient time do so, and instead Mr. Pugh was told by Mr. Cellini to falsify the maintenance documents to make it appear as though he had done a thorough inspection. Mr. Pugh notified Mr. Metzger that a proper crane inspection took more time than Mr. Cellini allowed.

17.    Mr. Pugh also complained that without proper lock out/tag out procedures in place, maintenance work on a crane is extremely unsafe.

18.    Mr. Pugh shared his safety concerns about the cranes with the crane operators.

19.    One crane operator, Clayton, opposed working on the cranes due to the safety issues addressed by Mr. Pugh.

20.    Upon information and belief, Clayton was terminated by Defendant a short time after Mr. Pugh was terminated.

21.    Mr. Pugh also shared his safety concerns about the cranes with Mr. Metzger, who said he would investigate further.

22.    Upon information and belief, Mr. Metzger never addressed the issue with Mr. Cellini or otherwise.

23.    One of Mr. Pugh's duties was training other employees on certain workplace inspections.

24.    During Mr. Pugh's training of an employee, Antoine, Mr. Pugh instructed Antoine not to perform certain tasks that were unsafe.

25.     Shortly thereafter, Mr. Cellini removed training duties from Mr. Pugh's job and no longer permitted him to train Antoine.

26.     On or around January 24, 2023, Mr. Pugh was tasked with performing maintenance work on a crane.

27.     At the start of his shift, Mr. Pugh saw that the crane was unavailable to work on, and proceeded to complete other necessary tasks given to him by Mr. Cellini.

28.     At no time was Mr. Pugh informed, by management or otherwise, that the crane was available and safe for maintenance work. Mr. Pugh was not told that he must stop what he was doing to work on the crane.

29.     On or around Wednesday, January 25, 2023, Mr. Pugh timely arrived at work and was immediately accosted by Mr. Cellini about why he had not worked on the crane the previous evening.

30.     Mr. Cellini falsely claimed that the crane was available for maintenance work at 5:00pm.

31.     Mr. Pugh left Mr. Cellini to speak to the crane operators, who told him the crane was not available until 6:00pm.

32.     When Mr. Pugh returned to Mr. Cellini and questioned why he was not truthful about his representation, Mr. Cellini got upset and claimed that Mr. Pugh could have moved the crane to perform the maintenance work.

33.     Mr. Pugh left Mr. Cellini to speak to other crane operators and asked them if he would have been able to safely move the crane to another location in the plant for maintenance work, and they said no, it would not have been safe to do so.

34.     The shift foreman, Mike (last name unknown), asked Mr. Pugh what was going on, and Mr. Pugh explained that Mr. Cellini was accosting him for not performing work on the crane, even though the crane was unavailable and could not be safely moved, and Mr. Pugh did not have the proper tools or equipment to perform the work.

35.     As a result of the disrespect shown by Mr. Cellini, Mr. Pugh told Mike that he was leaving for the day, and said "I'll see you Monday." Mike said, "OK."

36.     Mr. Pugh went to Mr. Cellini's office and informed him in front of another employee that he was leaving for the day. Mr. Cellini said, "OK."

37.     On or around Monday, January 30, 2023, Sandra Dean, a human resources employee, called Mr. Pugh and told him he was terminated for misconduct.

38.     Defendant failed to follow its Corrective Action Policy with respect to Mr. Pugh.

39.     While Mr. Pugh denies that he committed any infraction, the alleged "misconduct" of which Defendant accused him should have resulted in the first of four steps—a verbal warning—under Defendant's Corrective Action Policy.

40.     Mr. Pugh asked Ms. Dean why he did not instead receive a verbal warning under Defendant's Corrective Action Policy, but she did not provide an answer.

41.     Mr. Pugh had no record of performance issues with Defendant.

**Count I**
**Violation of the Pennsylvania Whistleblower Law**

42.     Plaintiff incorporates the allegations of Paragraphs 1 through 41 as if fully restated.

43.     Pennsylvania enacted the Pennsylvania Whistleblower Law ("Whistleblower Law" or "PWL") to prohibit retaliatory efforts by employers in response to lawful employee complaints. 43 P.S. § 1421 et seq.

44.     The Whistleblower Law provides: "No employer may discharge . . . or retaliate against an employee regarding the employee's compensation, terms, conditions, location or privileges of employment because the employee or a person acting on behalf of the employee makes a good faith report or is about to report, verbally or in writing, to the employer or appropriate authority an instance of wrongdoing or waste by a public body or an instance of waste by any other employer as defined in this act." 43 P.S. § 1423(a).

45.     Defendant constitutes an employer within the definition of the Whistleblower Law, 43 P.S. §1422, in that Defendant is a for profit corporation "which receives money from a public body to perform work or provide services relative to the performance of work for or the provision of services to a public body." 43 P.S. § 1422.

46.     Defendant constitutes a public body within the definition of the Whistleblower Law, 43 P.S. §1422, in that Defendant is a "body which is . . . funded in any amount by or through Commonwealth or political subdivision authority or a member or employee of that body." 43 P.S. § 1422.

47.     Defendant is funded "by or through" the Commonwealth because it is paid by a public entity for the contractual rendering of services. *See Romer v. MHM Health Professionals*, No. 20-1275, 2020 WL 6747418, at *3 (M.D. Pa. Nov. 17, 2020)(allegations that Defendant was paid by public entity for contractual rendering of services constitutes funding for the purposes of establishing Defendant is a public body under PWL).

48.     Specifically, Defendant is an employer and a public body because Defendant receives funding from the Commonwealth of Pennsylvania and Pennsylvania cities, counties, and other political subdivisions, in that it works on public projects in Pennsylvania, and acts as a direct contractor and/or subcontractor on those public projects.

49.    By way of example only, Defendant has received Commonwealth funds from the Pennsylvania Department of Transportation (PennDOT) and county funds from Mercer County, Pennsylvania in connection with its work on the Henry Road Bridge Superstructure Replacement Project.

50.    As another example, Defendant received funds from the Philadelphia Industrial Development Corporation—the management company for all real estate and economic development transactions of the public authority the Philadelphia Authority for Industrial Development—in connection with its work on the Philadelphia Navy Yard.

51.    "Wrongdoing" is defined as "A violation which is not of a merely technical or minimal nature of a Federal or State statute or regulation, of a political subdivision ordinance or regulation or a code of conduct or ethics designed to protect the interest of the public or the employer." 43 P.S. § 1422.

52.    Pennsylvania's Whistleblower Law provides that the report may be made to the employee's superiors, an agent of the employer, or to any appropriate authority. 43 P.S. § 1424(b).

53.    In this instance, Mr. Pugh made a report of wrongdoing to his supervisors, including Mr. Cellini, Mr. Metzger, and Mr. Collins, concerning conduct that violated federal and state laws, including but not limited to OSHA Sections 1926.952(b)&(e); 1910.333; 1910.137; and 1910.134, and the Pennsylvania General Safety Law, 43 Pa. Stat. § 25-1 *et. seq.*, including Sections 25-2(a), (b), (c), (e), and (h)--laws designed to protect the public.

54.    Mr. Pugh's reports constitute protected conduct under Pennsylvania's Whistleblower Law.

55.     Mr. Pugh was terminated in retaliation for complaining about consistent and unaddressed federal and state safety violations and as a result of his refusal to engage in unsafe conduct that contravenes federal and state safety standards.

56.     As a direct and proximate result of Defendant's unlawful conduct, Mr. Pugh was deprived of his job and has lost income in the form of wages, benefits, and future job opportunities.

57.     As a direct and proximate result of Defendant's unlawful conduct, Mr. Pugh has suffered noneconomic losses consistent with Pa. R.C.P. 223.3.

**Count II**
**Wrongful Discharge**
**(Pleaded in the Alternative)**

58.     Plaintiff incorporates the allegations of Paragraphs 1 through 57 as if fully restated.

59.     Defendant fired Mr. Pugh in retaliation for his complaints of workplace safety violations.

60.     Mr. Pugh's complaints related to conduct that directly violated the Pennsylvania General Safety Law, 43 Pa. Stat § 25-1 *et seq.*

61.     If, for any reason, Mr. Pugh cannot recover under the Pennsylvania Whistleblower Law, then Defendant's discharge of Mr. Pugh offends the public policy of the Commonwealth of Pennsylvania, as embodied in the General Safety Law. Specifically, the statute expresses a public policy that "[a]ll establishments shall be so constructed, equipped, arranged, operated, and conducted as to provide reasonable and adequate protection for the life, limb, health, safety, and morals of all persons employed therein," 43 Pa. Stat. § 25-2(a), and provides specific obligations relating to machines, cranes, and personal protective equipment that Defendant violated. *See id.* at §§ (b), (c), (d), and (h).

62.     As a direct and proximate result of Defendant's wrongful discharge of Mr. Pugh, he has suffered economic and non-economic losses.

WHEREFORE, Plaintiff demands judgment against Defendant in an amount exceeding this Court's arbitration limits, and the following relief:

    a.   Defendant shall pay Plaintiff back pay for all lost wages and fringe benefits of employment;

    b.   Defendant shall be ordered to reinstate Plaintiff to the position of Maintenance Technician, or pay front pay if reinstatement is not feasible;

    c.   Defendant shall pay Plaintiff compensatory damages under Count I, and compensatory and punitive damages under Count II;

    d.   Defendant shall pay reasonable attorneys' fees under Count I;

    e.   Any other relief which this Court deems just and proper.


Respectfully submitted,

ELZER LAW FIRM, LLC

/s/ Tamra K. Van Hausen
Tamra K. Van Hausen
Pa. I.D. No. 330577
Christine T. Elzer
Pa. I.D. No. 208157
100 First Avenue, Suite 1010
Pittsburgh, PA 15222
(412) 230-8436
(412) 206-0855 (fax)
tvanhausen@elzerlaw.com
celzer@elzerlaw.com

Attorneys for Plaintiff

9